IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| AVIVA LIFE AND ANNUITY COMPANY (n/k/a ATHENE ANNUITY AND LIFE COMPANY), AND AVIVA LIFE AND ANNUITY COMPANY OF NEW YORK (n/k/a ATHENE LIFE INSURANCE COMPANY OF NEW YORK), <br><br> Plaintiffs, <br><br> v. <br><br> DENNIS D'ALESSANDRO, RICHARD SHUTRAN, <br><br> Defendants. | Case No. <br><br><br> COMPLAINT <br><br> JURY DEMANDED |

Plaintiffs, Aviva Life and Annuity Company (n/k/a Athene Annuity and Life Company) and Aviva Life and Annuity Company of New York (n/k/a Athene Life Insurance Company of New York) (together, the "Aviva Plaintiffs" or "Aviva"), allege the following based upon the investigation undertaken by their counsel, which included a review of a complaint that the Securities and Exchange Commission filed against former Dewey senior managers, an indictment against three former Dewey senior managers in New York state court, publicly available news articles and reports, documents created and issued by Dewey & LeBoeuf LLP ("Dewey") and former Dewey senior managers, press releases and other public statements by Dewey and its former senior managers, and private investigations and discussions. Plaintiffs believe that after reasonable opportunity for discovery, substantial additional evidentiary support will exist for the allegations set forth herein.

## I.   <u>NATURE OF THE ACTION</u>[1]

1.      This action arises from the Aviva Plaintiffs' April 16, 2010 purchase of  $35 million in face amount of Senior Secured Notes (the "Notes"), offered and issued by Dewey in March and April of 2010 (the "Note Offering").  As a result of false and misleading statements that Dewey and Defendants  knew or should have known were deceptive, the Aviva Plaintiffs were misled in their purchase of the Notes, and have suffered significant damages.  This action seeks actual damages and attorneys' fees for violations of federal and state securities laws.

2.      In connection with the Note Offering, Dewey and Defendants D'Alessandro and Shutran—who respectively were Dewey's Chief Operating Officer and an Executive Committee Member and who controlled and managed Dewey's affairs, including the Note Offering— disseminated materially false and misleading information regarding Dewey's financial condition and Dewey's financial obligations and practices.  The Aviva Plaintiffs relied on this information and Dewey and Defendants' materially false and misleading disclosures in purchasing the Notes.

3.      Specifically, during the Note Offering, and as further detailed in this Complaint, Dewey and Defendants provided investors (including the Aviva Plaintiffs) with documents and presentations that included false financial information about Dewey, such as a Note Purchase Agreement, Private Placement Memorandum, and Investor Presentation.  Among other things, Dewey and Defendants provided documents stating that Dewey's 2008 cash flow was $293 million, but the real cash flow was $30 million lower.  In addition, Dewey and Defendants provided investors documents with a schedule of Dewey's purported debt but omitted $1.4 million Dewey owed a partner.  Dewey and Defendants also provided investors documents

---

[1] Plaintiffs are filing this Complaint with redactions, and without certain exhibits, in order to comply with a confidentiality agreement.  Plaintiffs will separately file a motion for a protective order so that Plaintiffs may file an unredacted copy of the complaint, and the remaining exhibits, under seal.

US2008 3790717 5

stating Dewey's purported accounting policies but omitted that Dewey had violated those policies by reclassifying disbursements for clients as fees and reversing decisions to write off certain costs.  Additionally Dewey and Defendants provided investors documents with revenue figures that were misleadingly based upon backdated checks from clients.    Complaint ¶¶ 73-79, 96, 100, 103, <u>Securities and Exchange Commission v. Davis et al.</u>, No. 14-1528 (S.D.N.Y. March 6, 2014) ("SEC Complaint"), attached as **[Ex. A]**.  Additionally, The offering memorandum represented that departing partners received their capital during the three years following their departure from the Firm.  Indictment at 8, <u>People of New York v. Davis et. al.</u>, No. 00773-2014 (Sup. Ct. N.Y. Cnty.) ("Indictment"), attached as **[Ex. B]**.  In fact,  Dewey falsely "classified draws and distributions paid to departing partners during their final years of employment as returns of capital, in order to enable the Firm to appear to meet another of its covenants." *Id.*

4.      Dewey and Defendants also represented that Dewey was financially sound and had a "conservative debt profile," when in fact, upon information and belief, Dewey was suffering from serious financial problems and had incurred, and was continuing to incur, hundreds of millions of dollars in undisclosed debt to certain of its highly compensated partners-- including Defendant Shutran.  **[Ex. E-1].**  In fact, at the time of the Note Offering, Dewey's financial situation was so dire that it was unable to make required payments due and owing to retired partners, a fact that was not disclosed to the Note purchasers such as the Aviva Plaintiffs.

5.      Upon information and belief, Dewey had an undisclosed practice of extending large guaranteed compensation agreements to certain partners (the "Compensation Guarantees"). These Compensation Guarantees obligated Dewey to pay the agreed upon compensation to these partners—at least $33 million annually—regardless of whether Dewey's operations generated

sufficient profits to fund the agreed upon compensation.  <u>SEC Complaint</u> at ¶ 108.   Defendant

Shutran was one of the beneficiaries of this arrangement, and thus he knew of the program;

Dewey promised to pay him at least $3 million annually from 2008 to and including 2010.  **[Ex.**

**E-1].**  Such Compensation Guarantees also meant that for each year that Dewey failed to meet

inflated revenue projections, Dewey became indebted to partners with Compensation Guarantees

and was obligated to use revenues from subsequent years to pay these partners for the guaranteed

compensation that had not been paid for past years.  At the time of the Note Offering, upon

information and belief, Dewey was indebted to partners with Compensation Guarantees for more

than $100 million, which was not disclosed to the Note purchasers.  These Compensation

Guarantees and Dewey's practice of entering into them were not only hidden from the Note

purchasers, but these facts were kept secret from the partnership at large.  The reason that Dewey

concealed these Compensation Guarantees was because they created the possibility of a mass

defection of partners, and ultimate collapse of Dewey, if they were revealed.  That is in fact what

ultimately happened, as described below.

6.     Upon information and belief, Dewey and Defendants D'Alessandro and

Shutran—as the firm's Chief Operating Officer and an Executive Committee member,

respectively, and as managers of the Note Offering—knew of or recklessly disregarded the

existence of the Compensation Guarantees, and the resulting dire financial situation they had

created.  Dewey and Defendants nonetheless intentionally or recklessly made material

misrepresentations about Dewey's financial condition and practices to the Aviva Plaintiffs in

order to induce the Aviva Plaintiffs and the other Note purchasers to purchase the Notes.  The

Aviva Plaintiffs purchased the Notes in reliance on statements and materials created and

disseminated by Dewey and Defendants.

7.     Upon information and belief, Dewey and Defendants' actions with regard to the Note Offering was part of a larger course of conduct engaged in by Dewey, Defendants, and other senior Dewey managers to intentionally or recklessly misrepresent Dewey's financial condition for the managers' own enrichment.  As part of this course of conduct, Dewey and Defendants and other firm managers repeatedly provided exaggerated revenue and profit figures to a well-known legal publication, misstating revenues by over $100 million per year.  Dewey managers also knowingly or recklessly made false and misleading statements to potential partners in order to induce them to join Dewey and make a capital contribution.  Dewey's senior managers then used these capital contributions for their own benefit.

8.     Dewey's firm managers profited richly from this course of conduct.  Though Dewey suffered from financial problems from its inception, upon information and belief, Dewey Chairman Steven Davis was paid approximately $4 million annually.  Dewey's Executive Director and Chief Financial Officer, Stephen DiCarmine and Joel Sanders, made nearly $2-3 million per year, receiving millions of dollars in bonuses.  Dewey's Chief Operating Officer, Dennis D'Alessandro, was Dewey's third highest paid administrator (behind DiCarmine and Sanders), with an annual salary of $900,000, $200,000 annual contractual bonuses, discretionary bonuses, and $200,000 annual payments into a trust for D'Alessandro's benefit.  See First Amended Complaint at ¶¶ 55, 60, 61, 63, *Jacobs v. D'Alessandro,* No. 14-01919 (MG) (Bankr. S.D.N.Y.) [ECF No. 15] ("Jacobs/D'Alessandro Complaint").   Defendant D'Alessandro's compensation was "astronomically generous" and "far in excess of the reasonably equivalent value of the services contracted for or provided." *Id.*, ¶ 64.   Executive Committee member Richard Shutran received a minimum of $3 million per year.

US2008 3790717 5

9.      In early 2012, Dewey's financial problems and the Compensation Guarantees were exposed, resulting in Dewey's collapse and insolvency.[2]  As a result of Dewey's and Defendants' conduct, and Dewey's resulting collapse, the Aviva Plaintiffs were forced to sell the Notes at a material discount and have, therefore, suffered substantial damages.

10.      Despite repeatedly canvassing publicly-available information and filing two other lawsuits related to the 2010 Note Offering, the Aviva Plaintiffs were unable to discover the scope and extent of D'Alessandro's and Shutran's control over and responsibility for the 2010 Note Offering until Dewey's bankruptcy trustee produced documents to Plaintiffs at the end of February 2015.

11.      Among the key facts that this production revealed are the following:

- That D'Alessandro was one of several senior Dewey mangers directly involved in promoting the Note Offering to potential investors like Plaintiffs. Indeed, D'Alessandro attended diligence events for that very purpose.

- D'Alessandro was aware of the compensation guarantees (as well as Dewey's accounting gimmicks).

- That Shutran was intimately involved in negotiating the terms of key documents associated with the Note Offering, and expressly asserted control over those terms.

- That Shutran insisted on reviewing the Note Offering's Private Placement Memorandum, which contained material misrepresentations.

---

[2] As will be discussed more fully below, Dewey filed for Chapter 11 bankruptcy protection.  See In re Dewey & LeBoeuf LLP., No. 12-12321 (MG) (Bankr. S.D.N.Y. May 28, 2012).

US2008 3790717 5

- That Shutran had a $3 million/year compensation guarantee from Dewey and yet chose not to disclose such guarantees in connection with the Note Offering.

## II.   <u>PARTIES</u>

12.     Plaintiff Aviva Life and Annuity Company (n/k/a Athene Annuity and Life Company) ("Aviva Life") is an insurance company incorporated under the laws of Iowa with its principal place of business in West Des Moines, Iowa.  Aviva Life purchased $19 million of Series D Senior Secured Notes and $14 million of Series C Senior Secured Notes issued by Dewey on April 16, 2010.

13.     Plaintiff Aviva Life and Annuity Company of New York (n/k/a Athene Life Insurance Company of New York) ("Aviva New York") is an insurance company incorporated under the law of New York with its principal place of business in Nyack, New York.  Aviva New York purchased $1 million of Series D Senior Secured Notes and $1 million of Series C Senior Secured Notes issued by Dewey on April 16, 2010.

14.      Defendant D'Alessandro is an individual and at all relevant times was Dewey's Chief Operating Officer, one of the firm's most senior officers.  Upon information and belief, D'Alessandro resides in New York.  As set forth more fully below, D'Alessandro also played a key role in the day-to-day control of Dewey, including control over the preparation and making of the statements alleged to be false herein, and misstated Dewey's financial condition for his own benefit.

15.     Defendant Shutran is an individual and was a member of Dewey's Executive Committee during the April 2010 Note Offering.  Upon information and belief, Shutran resides in New York.  As set forth more fully below, Shutran also played a key role in the day-to-day control of Dewey, especially ultimate authority and control over the preparation and making of

US2008 3790717 5

the statements alleged to be false herein, and misstated Dewey's financial condition for his own benefit.

16.     As Dewey's Chief Operating Officer, D'Alessandro was among Dewey's most senior management; indeed, he regularly attended the firm's Executive Committee meetings. Jacobs/D'Alessandro Complaint, ¶ 53.  D'Alessandro held substantial policy making, managerial, and firm-wide control over Dewey's day-to-day operations, particularly Dewey's finances.  Id., ¶ 51 ("D'Alessandro exercised substantial authority over the Debtor, dictated firm policy, and directed the disposition of the Debtor's assets."); id. at ¶ 56 (Dewey's Chairman delegated "day-to-day management" of the firm to D'Alessandro and others).  He was responsible for determining "how [Dewey] spent its money"; setting partner and associate billing rates for offices worldwide; setting and approving partner bonuses; approving new client matters; raising and lowering attorney compensation; executing payment agreements on behalf of Dewey with legacy firm retirees; approving the write-off of bills to clients, sometimes for tens of thousands of dollars; increasing capital allotments to Dewey offices worldwide; giving discretionary discounts to clients on billing rates; selling Dewey art worth tens of thousands of dollars; and approving partner lateral positions.  Id., ¶ 53.  Moreover, Dewey's Chairman Steven Davis delegated management authority to D'Alessandro.  Id., ¶ 56-57.   In short, D'Alessandro "exerted substantial control over [Dewey's] management decisions."  Id., ¶ 57; *see also Jacobs v. D'Alessandro,* Memorandum Opinion and Order Denying Defendant's Motion to Dismiss at 15, No. 14-01919, (Bankr. S.D.N.Y. Sept. 23, 2014) [ECF No. 23] ("The Court concludes that the allegations in the Amended Complaint . . . support a 'reasonable inference' that D'Alessandro was a 'person in control of the debtor,' sufficient to survive a motion to dismiss.").

-8-

17.     With this significant control and responsibility for Dewey's finances on a day-to-day basis, D'Alessandro was aware of Dewey's dire financial condition, falsification of Dewey's financial records, and the Compensation Guarantees in the years leading to the April 2010 Note Offering.  Indeed, the Aviva Plaintiffs only recently learned, from documents obtained in connection with third-party discovery propounded on the Dewey bankruptcy trustee, which was authorized by the Court in Plaintiffs' other suits against Dewey managers (the *Davis* and *Canellas* actions), the following:

- ████████████████████████████████████████████ Plaintiffs
  first learned these facts only after Dewey's bankruptcy trustee
  produced documents to Plaintiffs at the end of February 2015.

- In another December 4, 2008, email, Dewey's Chief Financial
  Officer advised D'Alessandro that Dewey might not have enough
  cash to pay for an IT project, ████████ and that the
  CFO did not want to "cook the books" anymore.  **[Ex. E-8]**.
  Hence D'Alessandro knew or recklessly disregarded that Dewey's
  2008 financial statements (which were summarized in the Note
  Offering materials) were false.  Plaintiffs learned of
  D'Alessandro's involvement in the Note Offering only after
  Dewey's bankruptcy trustee produced documents to Plaintiffs at
  the end of February 2015.

- In a November 10, 2009, email, Dewey's Chief Financial Officer
  warned D'Alessandro and others that Dewey might not have
  enough cash to pay its partners by January 31, particularly because
  $25 million of Dewey's income was "fake." **[Ex. E-13]**.  Hence
  D'Alessandro knew or recklessly disregarded that Dewey's 2009
  financial statements (which were summarized in the Note Offering
  materials) were false.  Plaintiffs learned of D'Alessandro's
  involvement in the Note Offering only after the Dewey bankruptcy
  trustee's production of documents to them in late February 2015.

- D'Alessandro knew about the compensation guarantees. ████
  ████████████████████████████████████████████
  Plaintiffs first learned these facts only after Dewey's bankruptcy
  trustee produced documents to Plaintiffs at the end of February
  2015.

18.     With this significant policy-making, day-to-day control and responsibility for Dewey's finances, D'Alessandro also had control and responsibility for the April 2010 Note Offering specifically.  That included control and responsibility for providing prospective investors with information about Dewey.  Indeed, the Aviva Plaintiffs also learned only after the Dewey bankruptcy trustee's production of documents to them in late February 2015 that D'Alessandro was one of several high-level Dewey attendees at an April 5th and 6th due diligence dinner and meeting for prospective Note-Offering investors.  **[Ex. E-21]**.

19.     Hence, D'Alessandro and other firm managers knew of Dewey's financial problems, the falsification of Dewey's financial records, and the existence, extent, and consequences of the Compensation Guarantees and recklessly or intentionally misrepresented or concealed this information from the public, auditors, partners at Dewey, and the Aviva Plaintiffs in connection with the April 2010 Note Offering.  By concealing Dewey's true financial condition in order to extend Dewey's existence, D'Alessandro and other firm managers reaped large salaries and bonuses incommensurate with Dewey's financial performance.

20.     Richard Shutran was likewise among Dewey's most senior management; indeed, he was not merely a practicing attorney but served as an Executive Committee member at the time of the April 2010 Note Offering.  As Plaintiffs recently learned from documents produced by Dewey's bankruptcy trustee at the end of February 2015, Shutran likewise had substantial policy making, managerial, and firm-wide control over Dewey's day-to-day operations.  Indeed, he co-chaired the firm's Corporate practice and chaired the firm's Global Finance Group; he was on the  Partner Compensation Committee, **[Ex. E-4,** see also **Ex C** at 7]**; he helped recruit laterals], **[Exs. E-3**, **E-2**, **E-5]**; he was involved in preparation of a financial summary to partners, **[Ex. E-9]**; he was involved in the firm's collections, **[Ex. E-11]**; he met with attorneys

-10-

in the Boston office to discuss strategic opportunities and help improve moral and connect the

office to the rest of the firm, **[Ex. E-6]**; and he was part of a Brazilian working group that

apparently explored opportunities for Dewey to expand into the Brazilian market, **[Exs. E-10 at 3,**

**E-12]**.  Of equal importance, the Aviva Plaintiffs have recently learned that, he not only signed

the Note Purchase Agreement issued as part of the April 2010 Note Offering but also managed

the run-up of that Note Offering.  For example:

- He was involved in reviewing and negotiating the terms of the Note Purchase Agreement.  Indeed, he controlled the terms of that agreement.  ▇▇▇▇▇▇▇▇▇▇  Plaintiffs first learned these facts only after Dewey's bankruptcy trustee produced documents to Plaintiffs at the end of February 2015.

- Shutran reviewed and controlled the content of the Private Placement Memorandum issued in connection with the Note Offering.  Likewise, Plaintiffs first learned of these facts only recently.

- Shutran was involved in ▇▇▇▇▇▇▇▇▇▇▇▇ drafts of documents related to the Note Offering.  E.g., **[Exs. E-17, E-22]**.  Plaintiffs first learned these facts only after Dewey's bankruptcy trustee produced documents to Plaintiffs at the end of February 2015.

- Shutran monitored outside-counsel fees related to the Note Offering.  **[Ex. E-24]**. Plaintiffs first learned these facts only after Dewey's bankruptcy trustee produced documents to Plaintiffs at the end of February 2015.

- Shutran monitored the Note Offering closing and tasks needed to complete the closing.  **[Exs. E-27, E-25]**.  Plaintiffs first learned these facts only after Dewey's bankruptcy trustee produced documents to Plaintiffs at the end of February 2015.

21.    Indeed, other former Dewey executives currently awaiting trial on criminal

charges related to the Note Offering (among other things) very recently appear[3] to have

---

[3] The executives do not identify Shutran by name, but information recently discovered by
Plaintiffs indicates that the executives were describing Shutran.

confirmed that Shutran "reviewed and drafted the documents associated with the Private

Placement"; "worked extensively to craft the terms of the Note Purchase Agreement" and

reviewed supporting documents like the "Private Placement Memorandum"; "negotiated on

behalf of [Dewey] in the" Note Offering; and "interacted with counsel for the prospective

purchasers" in the Note Offering.  **[Ex. C** at 6, 7 (Sanders Supplemental Brief); **Ex. D at** 6, 7

(DiCarmine Supplemental Brief)**]**.  Those executives also very recently appear to have confirmed

that Shutran was aware of the Compensation Guarantees and made the decision on Dewey's

behalf not to disclose those guarantees in connection with the Note Offering.  **[Ex. D** at 7-8, **Ex.**

**C** at 7**]**.  And Dewey's CFO appears to have confirmed that Shutran had "full access to the firm's

financial information and operative documents" and was thus "well aware of the firm's financial

position" (which was dire).  **[Ex. C** at 7**]**.

22.    Hence, Shutran likewise knew of Dewey's financial problems, the existence,

extent, and consequences of the Compensation Guarantees and recklessly or intentionally

misrepresented or concealed this information from the public, auditors, partners at Dewey, and

the Aviva Plaintiffs in connection with the April 2010 Note Offering.  By concealing Dewey's

true financial condition in order to extend Dewey's existence, Shutran reaped a large salary

incommensurate with Dewey's financial performance.

23.    At the very least, D'Alessandro and Shutran had the power to influence and

control the April 2010 Note Offering and the information provided to (or withheld from)

potential investors in that offering, including the Aviva Plaintiffs.

### III.    JURISDICTION AND VENUE

24.    Jurisdiction exists pursuant to § 27 of the Securities and Exchange Act of 1934

(the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  The claims asserted arise under

§§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5

US2008 3790717 5

promulgated by the Securities and Exchange Commission thereunder.  This Court may exercise

supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

25.    Venue is proper in this District pursuant to § 27 of the Exchange Act and 28

U.S.C. § 1391(b).  Many of the acts giving rise to the violations complained of occurred in this

District.

26.    In connection with the acts and conduct alleged in this Complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including the

mails and telephonic communications, in making representations to the Note purchasers and the

Aviva Plaintiffs.

## IV.    STATEMENT OF FACTS

### A.    Background of Dewey & LeBoeuf LLP

27.    Dewey was formerly one of the country's largest law firms.

28.    Dewey was created in October of 2007 upon the merger of two large, prominent

law firms (the "Merger"), Dewey Ballantine LLP ("Dewey Ballantine") and LeBoeuf, Lamb,

Leiby & McRae LLP ("LeBoeuf").

29.    Dewey Ballantine was founded in 1909.  At the time of the 2007 Merger, it had

approximately 600 attorneys in 12 offices worldwide.  Dewey Ballantine had a prestigious

background, taking its name from the former governor of New York, Governor Thomas E.

Dewey, but had suffered financial problems in early 2007 after failed merger talks with another

large law firm.

30.    LeBoeuf was founded in 1929 and had approximately 700 attorneys in 19 offices

worldwide in 2007.

31.    Following Dewey Ballantine's failed merger discussions referred to above,

Steven Davis (who was then LeBoeuf's Chairman) saw an opportunity to expand LeBoeuf and

US2008 3790717 5

approached Dewey Ballantine about the possibility of merging LeBoeuf and Dewey Ballantine.

Upon information and belief, Compensation Guarantees and bonuses were extended to LeBoeuf

and Dewey Ballantine partners and management as an incentive to agree to the Merger and

remain partners and employees of the newly formed combined Dewey law firm.  These

Compensation Guarantees appear to have been $6 million per year or more for some individual

partners.

32.     Dewey guaranteed $3 million a year to Defendant Shutran.

33.     According to public reports, the Merger was completed quickly and with little

disclosure of financial information to partners in the merged firms.  In fact, the merger

agreement given to partners of LeBoeuf and Dewey Ballantine did not contain financial details

about either law firm.

**B.     Events Leading Up to the Note Offering: Leadership After the Merger**

34.     After the Merger, the combined law firm had over 1,100 lawyers and 19 offices

worldwide.

35.     Davis remained Chairman of the combined firm. Dewey's Partnership Agreement

granted exceptionally broad authority to Davis.  Pursuant to the Partnership Agreement itself, not

only was Davis responsible for the "day-to-day management" of Dewey, but Davis could act

with the "full authority" of the Executive Committee and could borrow funds on Dewey's behalf.

Davis delegated his authority to senior firm managers like Chief Operating Officer

D'Alessandro, Chief Financial Officer Joel Sanders, and Executive Director Stephen DiCarmine.

**C.     In 2008, Financial Trouble and False Records**

36.     Around July 2008, Dewey entered an agreement with four banks that provided

Dewey with lines of credit.  SEC Complaint ¶ 18.  The agreement included a covenant that

required Dewey to maintain a $290 million annual cash flow. Id.  Senior firm managers knew

that breaching the covenant would prompt the banks to pull the credit lines, imperiling Dewey's ability to operate.  Id. ¶ 20.  ████████████████████████████████████

███████████████████████████████

37.     At the end of 2008, the firm was $200 million short of its budgeted revenue and $150 million short of budgeted profitability.  SEC Complaint, ¶ 20. Dewey's net income was 40% short of projections.  Complaint ¶ 26, Jacobs v. DiCarmine, et al., No. 13-1765 (Bankr. S.D.N.Y. Nov. 11, 2013) ("Jacobs/DiCarmine Complaint").  Senior firm managers were therefore concerned that the firm would breach the cash-flow covenant.  On December 4, 2008, Sanders emailed another senior manager Francis Canellas to ask what "revenue number must [Dewey] hit not to breach [its] covenants."  SEC Complaint ¶ 21.  Canellas wrote back, "The Covenant is on Cash Flow, described as net income plus depreciation.  The agreement call[s] for Cash Flow of 290M.  Budgeted expenses are 715 less 11M of depreciation.  Hence, we will need 994M in Revenue to be in compliance."  Id.  Canellas and Sanders alerted Davis and DiCarmine that the firm might breach the cash-flow covenant.  Id. ¶ 19.  ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████

38.     Also on December 4, Sanders wrote to D'Alessandro about spending on technology improvements that Sanders had not approved. SEC Complaint at ¶ 53.  Sanders wrote about the firm's cash-flow problems and was concerned that Dewey was being "hit with a few million [ ] worth of bills in January."  Id.  Sanders said, "I don't know anything about [the

contracts] and I don't want to cook the books anymore.  We need to stop doing that."  Id.; see also **[Ex. E-8]**.  That sentiment was short-lived.

39.     Later that month, clients tried delaying payments to Dewey to avoid breaching their own covenants with banks.  SEC Complaint ¶ 22.  On December 23, Sanders wrote to Davis, "That's precisely what I'm concerned about.  The banks will pull our lines in a heartbeat if we don't satisfy our covenants."  Davis responded, "That's what I told [another Dewey partner.]"  Id.

40.     On December 30, 2008, one day remained to collect the revenue necessary to avoid breaching the cash-flow covenant.  Sanders emailed  DiCarmine and Davis to inform them that the firm needed $50 million to avoid a breach.  Id. ¶ 23.  Davis responded, "Ugh."  Id.

41.     Canellas and Sanders decided  to use accounting tricks to avoid breach.  Id. ¶¶ 24-25.  Canellas drafted a "Master Plan" detailing improper itemized adjustments he would use to create the illusion of enough net profit to satisfy the covenant's cash-flow requirement.  Id. ¶ 25.  Canellas then instructed his and Sanders's staffs to make those adjustments and to devise others.  Id. ¶ 26.

42.     Around that time, Sanders emailed DiCarmine and stated: "We came up with a big one.  Reclass the disbursements."  Indictment at 51.  DiCarmine responded, "You always do in the last hours.  That's why we get the extra 10 or 20% bonus.  Tell [your wife], stick with me!  We'll buy a ski house next.  Just need to keep the ship [afloat]."  Id.

43.     After executing Canellas's Master Plan, Dewey employees believed that they had successfully manipulated the books to avoid a breach.  On December 31, 2008, a collections manager emailed Canellas with the subject line, "Great job dude.  We kicked ass!  Time to get paid."  SEC Complaint ¶ 27.  The collections manager also said, "Hey man, I don't know where

you come up with some of this stuff, but you saved the day.  It's been a rough year but it's been damn good.  Nice work dude. Let's get paid!"  <u>Id.</u> ¶ 28.

44.     On the same date, DiCarmine emailed Sanders to say, "You certainly cheered the Chairman [Davis] up.  I could use a dose."  Sanders responded, "I think we made the covenants and I'm shooting for 60%. . . . Don't even ask—you don't want to know."  <u>Id.</u> ¶ 57.

45.     But Dewey's collections and the adjustments in fact fell short.  On January 5, 2009, Canellas emailed another employee: "We are short on the covenant.  I really need your help with some ideas.  We need to hit it.  Start thinking and let's talk sometime this morning." <u>Id.</u> ¶ 29.

46.     That same day, Dewey employees exchanged emails explaining that another employee was "trying to get to a certain net income number" because of the covenant's cash-flow requirements.   Indictment at 53.

47.     Sanders emailed DiCarmine to say they should give an employee a "$200k bonus. I'm pushing him to go way out on a limb right behind me if you know what I mean."  <u>Id.</u> at 57. DiCarmine approved.  <u>Id.</u>

48.     The false adjustments that Canellas, Sanders, and their staffs undertook around year-end 2008 included the following examples.

49.     *First*, Canellas moved salary expenses to incorrect accounts:  He moved compensation for two salaried partners from an expense account on the 2008 general ledger to an equity-distribution account on the balance sheet.  SEC Complaint ¶ 31.  He also instructed a partner-relations specialist to move three other attorneys' compensation expenses to an equity distribution account on the balance sheet.  <u>Id.</u>  These adjustments created the illusion of lowering salary expenses and thus increasing net profit by $14.3 million.  <u>Id.</u>

50.     *Second*,  Canellas reclassified "disbursement" expenses:  Ordinarily when Dewey incurred "disbursement" costs (such as travel or legal research) billable to clients, Dewey recorded those costs as receivables and included a line item called "Accounts receivable-client disbursements" in financial records.  Id. ¶¶ 34-35.   If significant time passed without reimbursement by the client, a collections committee of Dewey partners would investigate and decide whether to write off the expense. Id. ¶ 36.  Doing so reduced Dewey's net profit.  Id.

51.     In early 2009, Canellas instructed Dewey's director of revenue support to reverse disbursements that the collections committee had written off.  Id. ¶ 37.  That reversal created the illusion of increasing Dewey's net profit by $3.8 million. Id. ¶ 38.

52.     *Third*, Canellas reclassified credit-card expenses:  Before the merger, Sanders and others at Dewey had incurred $2.5 million in American Express credit-card expenses, which had been recorded as an asset.  Id. ¶ 39.  Dewey had written the asset off around November 2008.  Id. In January 2009, however, Canellas directed two other employees to reverse the write-offs and reclassify the expenses as an "unbillable disbursement"—i.e., an asset related to unbilled client expenses.  Id. ¶ 40.

53.     On January 7, 2009, an employee emailed Canellas to say, "They didn't do the [reverse write-off] for Joel's amex.  Do you want them to put that entry in?"  Canellas responded, "Maybe we should do it to a pending billable matter."  The employee replied, "That would be less visible."  Id. ¶ 41.

54.     Dewey would again mischaracterize the Amex debt as an unbillable disbursement in 2010 and 2011.  Id. ¶ 42.  In January 2011, however, an employee wrote to Canellas that, "Before we close I think we should writeoff at least 1.2 million of the amex charges from Joel's

US2008 3790717 5

amex that have been sitting with us in [account] 1211 for so long.  I don't see how we'll get past the auditors another year. We should be able to reverse some smaller write-offs to offset it."  Id.

55.     *Fourth*, Canellas, Sanders, and their staffs incorrectly accounted for office-space expenses.  After the merger, Dewey had incurred a $3.3 million fee for vacating a London office early.  Id. ¶ 48.  Dewey's auditor had told Canellas that Dewey could amortize the fee only if Dewey remained a guarantor on the lease.  Id. ¶ 49.  Dewey's director of international finance had informed Canellas that Dewey was not a guarantor on the lease and thus could not amortize the fee.  Id. ¶ 50.  The fee therefore had been recorded as an expense.  In January 2009, however, Canellas and another employee decided that the expense should be reversed and amortized for the life of the lease, which would end in 2019.  Id.  A Dewey employee incorrectly told an auditor that the expense was for a consulting fee related to a new tenant's assumption of the London lease and thus should be amortized.  Id. ¶ 51.  Canellas and an employee also incorrectly amortized $5.2 million of fixed assets over the lease's life.  Id.

56.     At the end of 2008 (and after), Dewey's books and records also included another misrepresentation from a year before.  In late 2007, a client had been unable to pay Dewey $1.4 million for a Saudi Arabian partner's services.  Id. ¶ 43.  The partner had therefore temporarily loaned Dewey $1.4 million so that the $1.4 million would count towards his fee target for the year.  Id. ¶ 44. Dewey had incorrectly booked the loan as income. Id.  When the client did pay in August 2008, Dewey had booked the $1.4 million as income but did not immediately repay the partner.  Id. ¶ 44-46.  (Dewey did not repay the partner until more than two years after receiving the client's payment.  Id. ¶ 46.)

57.     In an email to a partner, Sanders described the $1.4 million loan as an "audit problem."  Id. ¶ 47.

US2008 3790717 5

58.     As a result of the books-and-records improprieties, Dewey misstated the firm's net profit by at least $36 million.  Id. ¶ 59.  Dewey therefore purported to meet the cash-flow requirement by $3 million.  Id.

59.     Canellas and Sanders expressed some concern that the Auditor would detect the problems with the books and records but believed that the Auditor was inept.  Id. ¶ 60.  When a new auditor was hired months later, Sanders would email Canellas to say, "I assume you [k]new this but just in case.  Can you find another clueless auditor for next year?"  Canellas said, "That's the plan. Worked perfect this year."  Id. ¶ 61.

60.     Although the Auditor was unaware of the improprieties, Canellas and his superiors were not.  In March 2009, Dewey's budget director sent Canellas and Sanders PowerPoint slides on the 2009 budget.  The slides were for a presentation to Dewey's Executive Committee.  Id. ¶ 63.  The director wrote, "Here [is] the revised presentation.  I think this is how you want it.  I have marked the slides you want to show Steve"—i.e., firm Chairman Steve Davis—"only but not in your presentation."  Id.  One of the pages marked "Steve's copy" included many of the false entries for 2008.  Id. ¶ 64.

61.     Based on their knowledge and responsibility for Dewey's finances and their senior positions, D'Alessandro and Shutran knew or recklessly disregarded the facts related to manipulation of Dewey's finances. Indeed, D'Alessandro received emails from Sanders discussing "fake income" and "cook[ing] the books."

**D.     In 2009, More Financial Trouble and False Records**

62.     As of December 31, 2008, Dewey's audited financial statements reported that assets exceeded liabilities.  Jacobs/DiCarmine Complaint ¶ 34.  But those statements measured Dewey's assets by historical book value, rather than their true economic value.  Id.  The statements also overstated the fair-salable value of assets and understated liabilities on existing

-20-

debts by omitting certain obligations like those to retirees.  Id. ¶¶ 34-35  In reality, Dewey was insolvent and unable to pay debts as they came due.  Id. ¶¶ 33-35.

63.     And its financial troubles continued (though Dewey around that time submitted a rosy financial report for the *American Lawyer*'s well-known annual survey of the country's 100 largest firms).  According to public reports, Davis sent an internal memo in early 2009 explaining that Dewey had failed to meet a projected 25 percent increase in partner pay in 2008 over 2007 (profits had instead dropped at least 15  percent).  In order to pay the Compensation Guarantees (more fully described below), Dewey used $60 million of 2009 revenues to make full or partial payments on 2008 guarantees.  This depleted Dewey's capital to nearly 50% of the minimum capital balance.   Moreover, Dewey had increasing trouble generating cash due to reduced demand for legal services.  Jacobs/DiCarmine Complaint ¶ 36. Based on his responsibility for Dewey's finances (particularly partner compensation) and his knowledge about the Compensation Guarantees, D'Alessandro either knew or recklessly disregarded these facts.  Likewise based on his knowledge of Dewey's finances and his knowledge of Compensation Guarantees (of which he was one beneficiary), Defendant Shutran knew or recklessly disregarded these facts.

64.     On May 28, 2009, Canellas sent Sanders an email with the subject line "Confidential-For your eyes only."  SEC Complaint ¶ 65.  The email included a list of suggested cost savings, including $7,500,000 for "Accounting Tricks."  Id.

65.     On November 10, 2009, Sanders emailed D'Alessandro, Canellas, Davis, and DiCarmine with an update on the firm's revenue collection.  Id. ¶ 68. Sanders wrote:  "I said at the Exec Committee meeting that if we can really collect (with no adjustments) between $850 and $875 then we will do between $14k and $15k per point [referring to the point system for

determining partner compensation]." Id. ¶ 68.  He added that, "If we bring $850M in the door

(real collections—no accounting adjustments including constructive receipt or reclassing

disbursements) we can get really aggressive and push the envelope to $14k per point. If we really

bring in $875M then we can push to get to $15k per point. Keep in mind though that at these

levels we will not have the cash to pay the partners by Jan 31 since $25M is fake income." Id.

66.     As year-end approached, Dewey was $100 million short of budgeted revenue and

$60 million short or budgeted profitability.  Id. ¶ 66.  Dewey and its managers again worried

about breaching the cash-flow covenant.  Id. ¶ 67.

67.     In December 2009, Sanders emailed Davis and DiCarmine to say that Dewey

would miss the "net income covenant by $100M. . . . I can probably come through with enough

'adjustments' to get us to miss the covenant by $50M-$60M[.]"  Id. ¶ 69.

68.     On the same day, DiCarmine emailed Sanders to ask whether they should bring

Canellas to lunch for "reassuring."  Id. ¶ 70.  Sanders responded, "I don't know.  He's starting to

wig a little.  Maybe he's hearing and seeing too much."  Id.

69.     In late 2009, Dewey disclosed limited information to the lender banks and

persuaded them to lower the cash-flow requirement to $246 million.  To meet this requirement,

Dewey and Canellas made approximately $23 million in adjustments, many through

inappropriate accounting methods.  Id. ¶ 72.

70.     Based on their knowledge and responsibility for Dewey's finances and their

senior positions, D'Alessandro and Shutran knew or recklessly disregarded the facts related to

manipulation of Dewey's finances. Indeed, D'Alessandro received emails from Sanders

discussing "fake income" and "cook[ing] the books."

### E.      Backdated Checks and A $4.6 Million Lost Retainer

71.      Throughout 2008 and 2009, Dewey's financial records included other irregularities.

72.      *First,* Dewey purportedly used the income-tax basis for accounting, meaning that the firm was supposed to record revenue when received rather than when billed.  SEC Complaint ¶ 74.  Around year-end 2008 and 2009, however, Davis encouraged Dewey partners to obtain backdated checks from clients so that the collections could be recorded as income for the prior year.  Id. ¶ 75.

73.      Other senior Dewey personnel knew of this backdating practice.  Sanders dictated a form email urging partners to obtain backdated checks from clients.  Indictment at 56; see also SEC Complaint ¶ 76.  DiCarmine also knew of an approved of the backdating efforts.  SEC Complaint ¶ 76.

74.      On information and belief, Defendant D'Alessandro knew of or recklessly disregarded this backdating practice as a result of his position as Chief Operating Officer and his responsibility for Dewey's finances including client billing.  On information and belief, Defendant Shutran also knew of recklessly disregarded this practice as a result of his position on the Executive Committee, his responsibility for Dewey's finances, and his status as a partner.

75.      *Second*, in November 2009, Dewey lost business from a company with a $5 million retainer.  SEC Complaint ¶ 79.  The client asked Dewey to return $4.6 million of the retainer.  Id.  Sanders delayed repayment until January 2010 to avoid reducing Dewey's 2009 income by $4.6 million.  Id. He also instructed the director of revenue to write off the $4.6 million over five months, rather than immediately.  Id.

76.      On information and belief, Defendant D'Alessandro knew of or recklessly disregarded this incorrect accounting as a result of his position as Chief Operating Officer and

US2008 3790717 5

his responsibility for Dewey's finances.  On information and belief, Defendant Shutran also knew of recklessly disregarded this incorrect accounting as a result of his position on the Executive Committee and his responsibility for Dewey's finances.

**F.    The Compensation Guarantees and Inflated Projections**

77.    During the 2007 merger, Dewey committed itself and was continuing to commit itself to extensive, burdensome Compensation Guarantees that relied on inflated revenue projections.

78.    According to public reports, for its first year of operations after the 2007 merger, Dewey projected an unrealistic 25 percent increase in profits over the combined profits of LeBoeuf's and Dewey Ballantine's best years.

79.    Although the full extent and timing of the Compensation Guarantees is still under investigation, following the Merger and until Dewey's collapse, Dewey entered into dozens, if not hundreds, of  Compensation Guarantees that were not disclosed to the public, investors, or the Dewey partnership at large.  These Compensation Guarantees were unusual and reckless not only because they were undisclosed, but also because of the number of partners that had them (at least 30% of partners had some sort of Compensation Guarantee), their size (many Compensation Guarantees were for more than $2 million per year, with some as large as $6 million annually), and because they were not linked to individual or Dewey's performance.

80.    The Official Committee of Former Partners in the Dewey bankruptcy has asserted that "prior to the 2007 Merger [of LeBoeuf, Lamb, Leiby & McRae LLP and Dewey Ballantine LLP], the Firm [Dewey] promised merger related bonuses and large salary guarantees to LeBoeuf partners, Dewey partners and top management of those firms."  Statement of the Official Committee of Former Partners With Respect to Motion of Ad Hoc Committee of Retired Partners of LeBoeuf, Lamb, Leiby & MacRae for Appointment of a Trustee or, In the

-24-

Alternative, for the Appointment of an Examiner Pursuant to Sections 1104(a) and 1104(c) of the United States Bankruptcy Code, at ¶ 2, In re Dewey & LeBoeuf LLP., No. 12-12321 (MG) (Bankr. S.D.N.Y. May 28, 2012) (Docket No. 348) (the "Statement of the Official Committee with Respect to Ad Hoc Motion").  These former Dewey partners have also asserted that "subsequent to the 2007 Merger, and throughout the Firm's existence, the Firm approved trusts and additional, undisclosed, long-term compensation obligations in fixed amounts to various 'rainmakers.'"  Id. (emphasis added).

81.     The Chief Restructuring Officer in the Dewey bankruptcy reports that Dewey "entered into compensation agreements with approximately 100 partners for certain guaranteed and incentive payments."  Declaration of Jonathan A. Mitchell Pursuant to Local Bankruptcy Rule 1007-2 And In Support of Chapter 11 Petition and First Day Motions, at ¶ 21,  In re Dewey & LeBoeuf LLP., (Docket No. 2) (the "Mitchell Declaration").

82.     A former LeBoeuf partner has asserted that Dewey "entered into contracts with select equity partners purporting to 'guarantee' compensation, in many cases without regard to the partner's actual performance and benefit to the Debtor. . . . [T]hese guaranteed compensation packages often allowed for significantly greater payments in comparison with other partners whose income was not guaranteed, which would naturally occur if overall net income of the firm was less than projected."  Declaration of Hugh T. McCormick in Support of Motion of Ad Hoc Committee of Retired Partners of LeBoeuf, Lamb, Leiby & MacRae for Appointment of a Trustee or, in the Alternative, for the Appointment of an Examiner Pursuant to Sections 1104(a) and 1104(c) of the United States Bankruptcy Code, at ¶ 5, In re Dewey & LeBoeuf LLP., (Docket No. 330-1).

US2008 3790717 5

83.     These Compensation Guarantees, and Dewey's practice of extending these guarantees, not only created a disincentive for Dewey's partners to seek out and create revenue, but also created the possibility that if revenues were lower than expected, partners without Compensation Guarantees would be paid significantly less than those with Compensation Guarantees, which could result in a large defection of partners and the ultimate collapse of Dewey.  These Guarantees also meant that if Dewey did not meet its projected profits, the firm would accrue large amounts of debt in order to pay the Compensation Guarantees or default on the Compensation Guarantees.  In short, these Compensation Guarantees made Dewey intensely unstable and reliant on unrealistic growth projections.

84.     After the Dewey bankruptcy trustee produced documents to Plaintiffs at the end of February 2015, Plaintiffs learned that D'Alessandro knew about these guarantees.  On information and belief, D'Alessandro knew of or recklessly disregarded the dangers that these guarantees represented, based on his senior position, knowledge of the Guarantees, and responsibility for Dewey's finances.

85.     After the Dewey bankruptcy trustee produced documents to Plaintiffs in late February 2015, the Aviva Plaintiffs have learned that Shutran also knew about these guarantees. Indeed, they learned only after the Dewey bankruptcy trustee produced documents to Plaintiffs in late February 2015 that Shutran himself received a $3 million/year Compensation Guarantee in 2007. **[Ex. E-1]**.  On information and belief, Shutran knew of or recklessly disregarded the dangers that these guarantees represented, based on his senior position, knowledge of the Guarantees, and responsibility for Dewey's finances.

US2008 3790717 5

### G.     The Note Offering

86.     At the end of 2009, Dewey owed lenders about $206 million, with $118 million due at the end of 2010.  SEC Complaint ¶ 80.  Dewey also needed $240 million to pay partners but had only $119 million in cash.  Id.

87.     In January 2010, Dewey decided to raise $125 million in a senior secured notes offering.  Id. ¶ 81.  Dewey retained an investment bank to serve as placement agent for the offering.  Id.  The agreement with the investment bank stated that the bank would rely solely on information Dewey provided.  Id. ¶¶ 81-82.

88.     Dewey and firm managers provided the investment bank with the 2008 audited financial statements and the 2009 compliance certifications, which contained Dewey's unaudited financial statements.  Id. ¶ 86.  On information and belief, D'Alessandro and Shutran knew of or recklessly disregarded this information as a result of their positions as Chief Operating Officer and Executive Committee member, their responsibility for the firm's finances, and their responsibility for the Note Offering.

89.     After the Dewey bankruptcy trustee produced documents to Plaintiffs at the end of February 2015, the Aviva Plaintiffs learned that Shutran played an integral role in controlling and negotiating the terms of the Note Offering and related documents.  To reiterate some examples:

- Shutran signed the Note Purchase Agreement, but he was more than just a signor:  He was involved in reviewing and negotiating the terms of the Note Purchase Agreement.  Indeed, he controlled the terms of that agreement.  ████████████████████

- Shutran reviewed the Private Placement Memorandum before its issuance to investors.

- Shutran was involved in ███████████████ drafts of documents related to the Note Offering. <u>E.g.</u>, **[Exs. E-17, E-22]**.

- Shutran monitored outside-counsel fees related to the Note Offering. **[Ex. E-24]**.

- Shutran monitored the Note-Offering closing and tasks needed to complete the closing. **[Exs. E-27, E-25]**.

- Other former Dewey executives currently awaiting trial on criminal charges related to the Note Offering (among other things) appear to have confirmed that Shutran "reviewed and drafted the documents associated with the Private Placement"; "worked extensively to craft the terms of the Note Purchase Agreement" and reviewed supporting documents like the "Private Placement Memorandum"; "negotiated on behalf of [Dewey] in the" Note Offering; and "interacted with counsel for the prospective purchasers" in the Note Offering. **[Ex. C** at 6, 7 (Sanders Supplemental Brief); **Ex. D** at 6, 7 (DiCarmine Supplemental Brief)]. Additionally, those executives appear to have confirmed that Shutran was aware of the Compensation Guarantees and made the decision on Dewey's behalf not to disclose those guarantees in connection with the Note Offering. **[Ex. D** at 7-8, **Ex. C** at 7].

90.    As further set forth below, the Aviva Plaintiffs have also learned only after the Dewey bankruptcy trustee produced documents to them at the end of February 2015 that D'Alessandro had control and influence over the Note Offering preparations. As Plaintiffs learned only after the Dewey bankruptcy trustee produced documents to Plaintiffs at the end of February 2015, D'Alessandro would work with other senior Dewey Managers such as Davis, DiCarmine, Sanders, and Canellas, to convince investors to participate. ████████████ ████████████████████

91.    Around February 2010, Dewey prepared a Private Placement Memorandum for distribution to potential investors. SEC Complaint, ¶ 85. Canellas, Sanders, and others compiled financial information to include in the Memorandum. <u>Id.</u> On March 1, 2010, Davis approved the Memorandum's form. <u>Id.</u> ¶ 87. Sanders sent it to the investment bank for

transmittal to investors.  The Aviva Plaintiffs have recently learned that Shutran reviewed the Private Placement Memorandum.

92.     In March 2010, an agent of Dewey made an offer to sell the Notes to the Aviva Plaintiffs in Iowa, and the offer was received by the Aviva Plaintiffs in Iowa.  The Notes were offered to the Aviva Plaintiffs and other institutional buyers.

93.     Dewey also scheduled a conference call with potential investors.  SEC Complaint, ¶ 90.  For the call, Dewey prepared a PowerPoint presentation with summaries of Dewey's financial statements and other information that was also included in the Private Placement Memorandum.  Id.

94.     Dewey held the conference call on March 8, 2010.  Id.  Canellas, Sanders, and DiCarmine attended the call.   Id.  Soon thereafter, Davis and Sanders decided to increase the Note-offer amount to $150 million.  Id. ¶ 91.

95.     Around this time, potential investors, including the Aviva Plaintiffs, submitted questions to the investment bank about information contained in the Private Placement Memorandum and Dewey's financial statements, the Investor Presentation, and/or the conference call.  Id. ¶ 88.  Senior Dewey managers and Dewey's financial staff helped provide answers.  Id. ¶ 89.

96.     As Plaintiffs learned only after the Dewey bankruptcy trustee produced documents to Plaintiffs at the end of February 2015, D'Alessandro, DiCarmine, Sanders, Canellas and another Dewey representative attended a diligence dinner and diligence meeting with potential investors and bankers on April 5 and 6, 2010, in order to answer investor questions about the Note Offering.  **[Ex. E-21]**.

97.     Also in April 2010, Davis led a meeting of the Executive Committee, which approved the Note Offering on terms listed in a Note Purchase Agreement.  SEC Complaint ¶ 92.

98.     As discussed in detail below, the Private Placement Memorandum, Investor Presentation, Note Purchase Agreement, and other representations (together, the "Offering Materials") materially misstated Dewey's financial condition at the time of the Note Offering and misrepresented and/or omitted the material fact of the existence of the large Compensation Guarantees that Dewey had extended to certain partners.  Dewey and its senior management (including D'Alessandro and Shutran) intentionally and/or recklessly created and disseminated the Offering Materials during the Note Offering to induce the Aviva Plaintiffs into purchasing the Notes.

99.     Based on their knowledge and responsibility for Dewey's finances, knowledge and responsibility for the Note Offering, and their senior positions, D'Alessandro and Shutran knew or recklessly disregarded the facts related to manipulation of Dewey's finances and the misrepresentation in the Note Offering materials.

100.     Shutran had ultimate control and authority over the Offering Materials and the misstatements therein.  Indeed, he negotiated the terms of the Note Purchase Agreement, supervised the content of the Private Placement memorandum, supervised drafting of various documents related to the Note Offering, and was otherwise deeply involved in Dewey's preparations for the Note Offering.

101.     D'Alessandro likewise had ultimate control and authority over the Offering Materials and the misstatements therein.  That is demonstrated by his senior position and (as what the Aviva Plaintiff have now learned) by his participation in the Note Offering

preparations, including attending meetings with potential investors along with other senior Dewey managers.

102.    At the very least, D'Alessandro and Shutran had responsibility and control over creation and dissemination of the Offering Materials as a result of their responsibility and control over the Note Offering.  Indeed, creation and dissemination of those materials and information was within the purview of both D'Alessandro and Shutran.

103.    The Aviva Plaintiffs relied on these material misrepresentations and omissions and have been substantially financially damaged as a result.

**H.    Misrepresentations and Omissions in the Private Placement Memorandum**

104.    The Private Placement Memorandum contained financial information and other statements regarding Dewey's financial performance to demonstrate Dewey's economic soundness, but included untrue statements of material facts and also omitted material facts necessary to make the statements therein not misleading.  These misstatements and omissions included three types, described below.

105.    Based on their knowledge and responsibility for Dewey's finances, knowledge and responsibility for the Note Offering, and their senior positions, D'Alessandro and Shutran knew or recklessly disregarded the facts related to manipulation of Dewey's finances and the misrepresentation in the Private Placement Memorandum.

**1.    Misstatements Relating to Financial Statements**

106.    The Private Placement Memorandum included several misrepresentations related to the firm's financial statements and records.  On information and belief, D'Alessandro and Shutran (who reviewed the Memorandum) knew or recklessly disregarded these facts based on their responsibility for and knowledge of Dewey's finances, responsibility for the Note Offering, and senior positions.  For example:

-31-

107.    The Memorandum included summaries of Dewey's 2008 and 2009 balance sheets and income statements, which were inflated for the reasons described above.  SEC Complaint ¶ 95.

108.    The Memorandum stated that Dewey's 2008 Cash Flow was $293 million, a figure exaggerated by over $30 million.  Id. ¶ 96.

109.    The Memorandum included a Schedule of Dewey's purported debt but omitted the $1.4 million that Dewey owed a partner in Saudi Arabia.  Id. ¶ 100.

110.     In the Memorandum, Dewey stated that the "billing value for firm services on client matters is recorded as client disbursements and reflected as a reduction of the company's expenses when charged to clients . . . . Client disbursements receivables are written-off when deemed uncollectible."  Id. ¶ 102.  Dewey did not disclose that it had violated this policy by restoring disbursements already written off and by reclassifying certain disbursements as fees. Id. ¶ 103.

### 2.    Misstatements About Dewey's Financial Condition:  Delayed Payments to Retired Partners

111.    The Private Placement Memorandum stated that Dewey had a "strong financial condition" and that the firm had seen a "noticeable improvement in financial results" since the merger.   As described above, Dewey's financial condition was poor.  In fact, the condition was so bad that Dewey was reneging on commitments to retired partners.

112.    Pursuant to the LeBoeuf, Lamb, Leiby & MacRae Partners' Retirement Plan, as amended and restated effective as of November 15, 1990 (the "LeBoeuf 1990 Retirement Plan"), Dewey was obligated to make monthly installment payments to certain retired partners.  See Declaration of Davis R. Robinson In Support of Motion of Ad Hoc Committee of Retired Partners of LeBoeuf, Lamb, Leiby & MacRae For Appointment of A Trustee or An Examiner

-32-

Pursuant to Section 1104(a) and 1104(c) of the United States Bankruptcy Code, at ¶¶ 1, 4,  In re

Dewey & LeBoeuf LLP., (Docket No. 330-2).

113.    Unbeknownst to the Aviva Plaintiffs, however, on September 18, 2009, Dewey

had informed these retired partners that all payments due in September, October, November, and

December would not be made until "the first quarter of 2010."  See id. at ¶ 5.

114.    In February of 2010, Dewey informed these retired partners that it had wired only

30% of the monthly payment due and would make future payments on a quarterly basis.  By

letter dated March 5, 2010, however, Davis informed the retired partners that it would pay all

past due amounts to the retired partners by April 1, 2010 and would resume monthly payments

beginning in April 2010.

115.    Subsequently, on April 5, 2010, DiCarmine informed the retired partners by email

that Dewey would pay amounts due from 2009 by April 15, 2010 (just one day prior to the

execution of the Note Purchase Agreement finalizing the sale of the Notes), would pay amounts

due from the first quarter of 2010 by May 1, 2010, and would thereafter resume monthly

payments.

116.    Some former partners threatened litigation against Dewey to enforce the amounts

owed under the partnership agreement. SEC Complaint ¶ 106.

117.    Dewey's failure to meet its obligations under the LeBoeuf 1990 Retirement Plan

and communications to the retired partners by Davis and DiCarmine show that at the time of the

Note Offering, Dewey was struggling to meet its financial obligations and that Dewey's firm

managers were fully aware of this fact.

118.    On information and belief, D'Alessandro (who had specific responsibilities for

partner compensation) and Shutran knew or recklessly disregarded these facts based on their

senior positions, responsibility for the Note Offering, and responsibility for Dewey's finances. Dewey, D'Alessandro, and Shutran at least recklessly materially misrepresented Dewey's financial condition in the Private Placement Memorandum.

119.  Moreover, Dewey and Defendants failed to disclose problems with the pension payments or the threatened litigation.  Id. ¶¶ 105-106.

### 3. The Omission of the Compensation Guarantees and Other Misstatements Related to Partner Compensation

120.  The Private Placement Memorandum also was materially misleading because it omitted any discussion of the existence of and risk presented by large Compensation Guarantees that Dewey had extended to certain partners and its practice of extending such guarantees.

121.  As set forth above, upon information and belief, at the time of the 2010 Note Offering, Dewey had extensively obligated itself to pay large Compensation Guarantees to various Dewey partners and employees, including Shutran.  By year-end 2009, Dewey had entered into many such contracts, requiring minimum annual base and bonus payments of over $33 million.  SEC Complaint ¶ 108.

122.  The material fact of the existence of these Compensation Guarantees and Dewey's practice of extending these guarantees was not disclosed in the Private Placement Memorandum (or anywhere else in the Offering Materials).

123.  In fact, the Private Placement Memorandum misrepresented the material fact of the existence of the Compensation Guarantees by making misleading statements regarding Dewey's compensation practices.

124.  The Private Placement Memorandum stated that "[f]ixed draws for partners are presently $25,000 per month ($300,000 annually) payable at the end of each month unless determined otherwise by the Executive Committee in anticipation of losses for the year."  The

-34-

US2008 3790717 5

Memorandum also stated that "partners are paid distribution payments of earnings in excess of draws in periodic installments, in amounts deemed prudent in relationship to the Firm's overall cash flow needs to bring them to their share of earnings for the year." Id. ¶ 109.  These statements omitted the material fact of the existence of partner Compensation Guarantees and were untrue and misleading because, due to the Compensation Guarantees, certain draws and payments were made regardless of the anticipation of losses for the year or Dewey's cash flow needs. Id.

125.    The Private Placement Memorandum stated that "[t]he Firm does not employ an incentive compensation plan, but to the extent earnings exceed plan, partners share proportionately."  This statement of material fact was untrue and misleading because partners did not share proportionately because of the undisclosed Compensation Guarantees.

126.    The Private Placement Memorandum also failed to disclose that the effect of these Compensation Guarantees was that, if Dewey's actual net income was less than what was budgeted for the year, any shortfall in the net income that was distributed to partners with such Compensation Guarantees became an additional debt of the firm, further reducing the net income potentially available to other partners in future years.  It also failed to disclose that if these Compensation Guarantees became known to the partnership, the result could be a "domino effect" of partner defections, and the ultimate collapse of Dewey.[4]

127.    The existence of, and risk presented by, the Compensation Guarantees was a material fact that should have been accurately presented and/or disclosed in the Private

---

[4] This was in fact the ultimate outcome.  See Memorandum in Support of the Motion of Ad Hoc Committee of Retired Partners of LeBoeuf, Lamb, Leiby & MacRae for Appointment of a Trustee or, in the Alternative, for the Appointment of an Examiner Pursuant to Sections 1104(a) and 1104(c) of the United States Bankruptcy Code, at ¶ 6,  In re Dewey & LeBoeuf LLP., (Docket No. 330).

US2008 3790717 5

Placement Memorandum and elsewhere in the Offering Materials.  In fact, as part of Dewey's

bankruptcy proceedings, the Chief Restructuring Officer of Dewey's Chapter 11 bankruptcy

filing cites the existence of Compensation Guarantees as a key factor in Dewey's bankruptcy.

Mitchell Declaration at ¶ 23 ("These negative economic conditions, combined with the Firm's

rapid growth and partnership compensation arrangements, created a situation where the cash

flow was insufficient to cover capital expenses and full compensation expectations.").

128.     Relatedly, Dewey's financial statements disclosed approximately $7 million in

payments for two partners' long term employment agreements, entered in 2007.  SEC Complaint

¶ 110.  The statements did not disclose the other guaranteed-compensation agreements.  Id.

129.     Additionally, the offering memorandum stated substantially that departing

partners received their capital during the three years following their departure from the Firm.

Indictment at 8.  But Dewey "reclassified draws and distributions paid to departing partners

during their final years of employment as returns on capital, in order to enable the firm to appear

to meet another of its covenants."  Id.

130.     D'Alessandro and Shutran knew or recklessly disregarded these facts based on

their responsibility for and knowledge of Dewey's finances, responsibility for the Note Offering,

and senior positions.  Concerning the Compensation Guarantees specifically, D'Alessandro and

Shutran knew about those Guarantees for the reasons described above.  And another former

executive appears to have revealed recently, Shutran and other senior managers decided not to

disclose the guarantees.

> [T]he evidence should show that a D&L partner and Executive
> Committee member, who was a banking lawyer familiar with
> private placements and disclosure rules and requirements,
> represented D&L in connection with the Private Placement,
> negotiated on behalf of the firm, and reviewed and contributed to
> the operative documents.  The evidence should show that this D&L

partner knew about the overhang [i.e., Compensation Guarantees] when he was performing these tasks, not only as a member of the Executive Committee and the firms' Compensation Committee, but also because money he was owed was part of the overhang. **The evidence should show that this lawyer would have decided—perhaps alone, perhaps in conjunction with other Executive Committee members and other lawyer working on the deal—whether to disclose the "overhang."**

**[Ex. D** at 7-8 (emphasis added)].

> I.     **Misrepresentations and Omissions in the Investor Presentation**

131.     The Aviva Plaintiffs attended an investor presentation by conference call in Iowa on March 8, 2010.  The Aviva Plaintiffs were provided with written materials for this presentation entitled "Investor Presentation."  Like the Private Placement Memorandum, the Investor Presentation contained financial information and other statements regarding Dewey's financial performance to demonstrate Dewey's soundness.  Like the Private Placement Memorandum, however, the Investor Presentation contained untrue statements of material facts and omitted material facts necessary to make the statements therein not misleading.

132.     The PowerPoint Investor Presentation included summaries of Dewey's 2008 and 2009 balance sheet and income statements, which were incorrect for the reasons stated above. SEC Complaint ¶ 111.

133.     The Investor Presentation cites Dewey's purported "strong financial condition and conservative debt profile," when in fact at this time, as set forth above, Dewey was experiencing serious financial problems.

134.     Neither orally nor in the written Investor Presentation were the Compensation Guarantees disclosed to the Aviva Plaintiffs and other investors.

135.     In fact, during this presentation, Dewey managers participating in the call materially misrepresented Dewey's practices related to partner compensation by explaining that

-37-

Dewey put a certain percentage of a partner's compensation in a trust pursuant to an agreement with the partner called a "lock-up" agreement.  They referred to this practice as the "Long Term Incentive Program" or "LIP."  This practice was falsely and misleadingly presented as *strengthening* Dewey financially as allegedly it gave partners an incentive not to leave Dewey.  Dewey and its senior managers also represented that these "lock-up" agreements were fully funded.

136.    Around this time, moreover, potential investors, including the Aviva Plaintiffs, submitted follow-up questions to Dewey.  Id. ¶ 112.  Their questions related to issues described above, including unfunded pension obligations, write-offs and collectability of receivables, and partner compensation.  Id.  Canellas, Sanders, and others helped answer these questions.  Id. ¶ 114.  They again failed to correct their misstatements and omissions.  Id. ¶ 112-113.

137.    On information and belief, D'Alessandro and Shutran knew or recklessly disregarded these facts based on their responsibility for and knowledge of Dewey's finances, responsibility for the Note Offering, and senior positions.

### J.    Misrepresentations in the Note Purchase Agreement

138.    The Note Purchase Agreement also included misrepresentations and omissions.

139.    The Agreement said that neither it, nor the Private Placement Memorandum, nor Dewey's financial statements  contained "any untrue statements of material fact or omit[ted] to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which were made."  SEC Complaint ¶ 117. The Agreement likewise said that  all of the financial statements provided to purchasers "fairly present[ed] in all material respects the financial position of the Company and the Related entities . . . and the results of their operations and cash flows for the respective periods so specified and have been prepared on a tax basis."  Id. ¶ 118.  As explained above, these documents contained incorrect information.

-38-

140.     The Agreement included a schedule of Dewey's existing debt but omitted the $1.4 million Dewey owed the partner in Saudi Arabia.  Id.  ¶ 116.

141.     The Agreement stated that there were no threatened suits against Dewey.  Id. ¶ 119.  But former partners had threatened litigation for delinquent pension payments.  Id.

142.     The Agreement stated that Dewey would maintain proper books and records necessary to prepare financial statements on a tax basis.  Id. ¶ 120.  But Dewey and Defendants did not intend to maintain proper books and records during the Note Offering; at the time they were incorrectly writing off $4.6 million in retainer fees.  Id.

143.     The Agreement stated that Dewey would not incur, assume, or suffer to exist any debts other than those listed.  Id. ¶ 121.  Yet Dewey and Defendants did not disclose the $1.4 million loan that Dewey owed a partner in Saudi Arabia.  Id.

144.     In the Agreement, Dewey agreed to provide investors like the Aviva Plaintiffs with quarterly certifications that Dewey was not in breach of covenants with lenders and related financial information.  Those financial disclosures included false information.  Id. ¶¶ 7, 123. For example, the disclosures overstated Dewey's income after late 2009 and early 2010, because at that time Dewey delayed fully writing off $4.6 million of a retainer Dewey repaid a client.  Id. ¶ 79.

145.     On information and belief, D'Alessandro and Shutran knew or recklessly disregarded these facts based on their responsibility for and knowledge of Dewey's finances, responsibility for the Note Offering, and senior positions.

### K.     Sale of the Notes

146.     Pursuant to the Note Purchase Agreement, on April 16, 2010, Dewey issued: (a) $40 million aggregate principal amount of 4.49% Series A Senior Secured Notes due April 16, 2012; (b) $15 million aggregate principal amount of 5.39% Series B Senior Secured Notes due

US2008 3790717 5

April 16, 2015; (c) $40 million aggregate principal amount of 6.10% Series C Senior Secured Notes due April 17, 2017; and (d) $55 million aggregate principal amount of 6.65% Series D Senior Secured Notes due April 16, 2010.

147.     In reliance on the representations made by Dewey and Defendants and pursuant to the Note Purchase Agreement, on April 16, 2010, in Des Moines, Iowa, the Aviva Plaintiffs purchased a total of $35 million in Series C and D Senior Secured Notes from Dewey.

148.     In deciding to purchase the Notes, the Aviva Plaintiffs relied upon the Offering Materials and other statements made by Dewey, and firm managers.  Had these materials and statements accurately and adequately disclosed the facts either misstated or omitted, as detailed above, a completely different risk profile for investing in the Notes would have been presented. The Aviva Plaintiffs did not know, nor could they have known through the exercise of reasonable care, of the untrue statements and omissions set forth herein.

**L.     The Capital Contribution Arrangement**

149.     Upon information and belief, the Note Offering was part of a larger course of conduct engaged in by Dewey and firm managers to misrepresent Dewey's financial condition for their own enrichment.  As part of this course of conduct, they induced new partners to join Dewey, extending Compensation Guarantees that they knew or should have known would never be paid in order to collect fresh capital contributions.

150.     Dewey and its management approached partners at other law firms about joining Dewey pursuant to Compensation Guarantees.  Through public and private oral and written statements, including providing financial information to *The American Lawyer*, Dewey and its management represented to prospective partners that Dewey was prosperous and financially stable.

US2008 3790717 5

151.    Dewey's management made specific representations to these partners regarding Dewey's financial stability following the merger.  One such partner recalls a telephone conversation with Sanders in which he directly asked Sanders if Dewey "had any substantial debts or financial obligations." Complaint ¶ 20, <u>Bunsow v. Davis</u>, No. CGC-12-521540 (Cal. Super. Ct. June 12, 2012) (Docket No. 3) (the "Bunsow Complaint"). Sanders misleadingly answered that Dewey had only "private financing" on "very favorable" terms and did not have any debts or obligations that would affect Dewey's financial performance when he knew that Dewey had serious financial problems and owed $100s of millions in deferred compensation.  <u>Id.</u>

152.    Dewey and its management extended Compensation Guarantees to these new partners but required them to make a capital contribution representing a percentage of their respective Compensation Guarantees.  Partners could choose between taking a personal loan to fulfill the capital contribution in a lump sum or having a percentage of the capital contribution deducted from their disbursements from Dewey.  These capital contributions were to be returned to partners upon their departure from Dewey.

153.    Once partners joined Dewey, Dewey's management sent them a memorandum authored by Sanders regarding taking a loan to fulfill their capital contributions.  <u>See</u> <u>Citibank v. Otillar</u>, No. 12-CV-5092 (LLS) (S.D.N.Y. May 31, 2012) (Docket No. 7) (the "Otillar Declaration") at ¶¶ 26-29.  Sanders's memorandum encouraged new partners to take these loans, explaining that the terms were very favorable and that Dewey would make certain interest payments on their behalf.

154.    Dewey and its management knew or should have known that Dewey was using profits from successive years to pay deferred compensation due under the Compensation

Guarantees, such that they would never be able to pay these Compensation Guarantees or repay the capital contributions.

155.    In fact, despite promises by Dewey's management, these partners never received a material distribution of their guaranteed income.  <u>See</u>, <u>e.g.</u>, Otillar Declaration at ¶ 47.

156.    Upon information and belief, partners were induced into making a capital contribution to Dewey and they were never paid their guaranteed compensation; nor was their capital contribution refunded.  Dewey's management used these new capital contributions for their own enrichment.

**M.    Revelation of the Compensation Guarantees, Misstated Financials, and Chapter 11 Bankruptcy**

157.    In October 2011, DiCarmine for the first time disclosed to Dewey partners that Dewey had extended Compensation Guarantees to approximately 100 of Dewey's 300 partners. The full extent and value of the guarantees, however, was not disclosed at this time, even when partners questioned DiCarmine about the extent of the back pay owed to partners.

158.    On or around January 27, 2012, Davis disclosed to the partnership that due to lower than expected profits and deferred compensation due under the Compensation Guarantees, no 2011 profits would be distributed.  This revelation sparked a mass exodus of partners.

159.    Upon information and belief, on February 13, 2012, Davis called a meeting of certain Dewey partners.  During this meeting, Davis informed the partners that Dewey was unable to pay the approximately $250 million it owed partners per the Compensation Guarantees.

160.    On or about March 27, 2012, Dewey replaced Davis as the sole Chairman with a five member "Office of the Chairman," consisting of Davis, Shutran, and three other Dewey partners.

US2008 3790717 5

161.    In early April of 2012, *The American Lawyer* revealed that Dewey had overstated its revenues to the magazine starting with fiscal year 2008.

162.    As explained above, Dewey's financials were misstated for 2008 and 2009. Moreover, it appears Dewey and its management misstated Dewey's 2010 and 2011 financials to *The American Lawyer* by more than $100 million per year.  See Julie Triedman, <u>Dewey & LeBoeuf's 2010, 2011 Profits, Revenues Revised</u>, The American Lawyer, April 3, 2012, http://amlawdaily.typepad.com/amlawdaily/2012/04/dewey-2010-2011-financials-revised.html. Dewey management, including Davis, initially told *The American Lawyer* that revenues for 2011 were $935 million, up from $909.9 million in 2010.  <u>Id.</u>  To the contrary, the actual revenue figure for 2011 was $782 million, and the actual revenue figure for 2010 was $759.5 million.  <u>Id.</u>

163.    It is possible that the discrepancies are even larger than publicly reported. According to the Statement of Financial Affairs filed in the Dewey bankruptcy, gross revenues in 2011 were approximately $655 million (not $935 million or even $782 million) and in 2010 were approximately $628 million (not $909.9 million or even $759.5 million).  <u>See</u> Statement of Financial Affairs, at 13, <u>In re Dewey & LeBoeuf LLP.</u>, (Docket No. 294) (the "Statement of Financial Affairs").

164.    According to public reports, between January and early April of 2012, approximately fifty partners left Dewey to join other law firms.

165.    On or about April 16, 2012, upon information and belief, Dewey partners were informed that Price Waterhouse Coopers ("PWC") had performed an audit of the compensation distributions made by Dewey in 2011 and 2012.  PWC informed the assembled partners that Dewey had not been making distributions pursuant to Dewey's partnership agreement "for many years."  <u>See</u> Bunsow Complaint at ¶ 31.  PWC also reported that 83% of Dewey's profits had

-43-

been used by Dewey's senior managers for "improper payments to themselves and other privileged partners."  Id.

166.    On or about April 29, 2012, it became public that Davis was under investigation by the Manhattan District Attorney for allegations of criminal wrongdoing in his role as Chairman.  Davis was removed from his leadership position at Dewey at this time.  DiCarmine's and Sander's last day of employment with Dewey was on or around May 15, 2012.

167.    On or around April 28, 2012, Dewey informed its partners that they were free to go elsewhere.

168.    On or about April 30, 2012, Dewey advised the Aviva Plaintiffs that certain Events of Default had or would occur under the Note documents.

169.    The Aviva Plaintiffs sold the Notes on May 4, 2012 for $19,270,000, a significant loss.

170.    Dewey filed for Chapter 11 bankruptcy on May 28, 2012.  It is the largest U.S. law firm failure to date.

171.    Shockingly, in the months leading up to Dewey's Chapter 11 bankruptcy filing, DiCarmine was paid over $1 million in bonuses. Statement of Financial Affairs at 141-42.  In fact, in the year preceding Dewey's Chapter 11 bankruptcy filing, DiCarmine and Sanders each received more than $2.9 million in salary, bonuses, and expense reimbursement.  Id. at 141-55.

**N.    Aviva Plaintiff's Diligence and Discovery of the Factual Basis for Claims against D'Alessandro and Shutran.**

172.    The Aviva Plaintiffs retained counsel and undertook an investigation of publicly available information about the Note Offering and Dewey's collapse, including court records, news articles, witness interviews, and so on.  Plaintiffs uncovered sufficient facts to state a claim against Messrs. Davis, DiCarmine, and Sanders, but not D'Alessandro and Shutran.  On

US2008 3790717 5

December 14, 2012, the Aviva Plaintiffs therefore sued Davis, DiCarmine, and Sanders in this Court. *See Aviva v. Davis*, No. 12-603 (S.D. Iowa Dec. 14, 2012).

173.    The defendants then filed a motion to dismiss the Complaint on October 9, 2013. The Court denied the motion.

174.    On March 6, 2014, a New York grand jury indicted Davis, DiCarmine, Sanders, and another former Dewey employee.  Also on that date, the Securities and Exchange Commission filed a complaint against Davis, DiCarmine, Sanders, Canellas, and another former Dewey employee.

175.    Based on information in the Indictment and SEC Complaint, the Aviva Plaintiffs filed a Complaint in this Court against Francis Canellas on March 25, 2014. *See Aviva v. Canellas*, No. 14-00117 (S.D. Iowa March 25, 2014).

176.    Plaintiffs again canvassed publicly-available materials to identify other potential defendants (such as court records and news reports), but still did not find enough information to warrant a suit against D'Alessandro or Shutran.

177.    In the Aviva Plaintiff's suits against the *Davis* defendants and against Mr. Canellas, the Court stayed the case until the criminal matter concludes.

178.    In November 2014, the Court allowed the Aviva Plaintiffs to conduct third-party discovery in order to identify other potential defendants.  *See Aviva v. Davis*, No. 12-603 (S.D. Iowa Nov. 24, 2014) [Doc. No. 125]; *Aviva v. Canellas*, No. 14-117 (S.D. Iowa Nov. 12, 2014) [Doc. No. 40].

179.    On December 24, 2014, the Aviva Plaintiffs subpoenaed Dewey's Bankruptcy Trustee for documents pertinent to the April 2010 Note Offering.

180.    The Trustee produced documents for the first time in mid-February 2015.

US2008 3790717 5

181.    Plaintiffs did not discover the facts constituting the violations alleged herein until after the Trustee produced those documents.

182.    Plaintiffs at all times exercised reasonable diligence in investigating the facts to support Plaintiffs' claims and, in exercising such reasonable diligence, could not have discovered earlier the facts constituting the violations alleged in this Complaint.

**O.    Scienter Allegations**

183.    As alleged herein, Dewey, D'Alessandro, and Shutran knew of Dewey's ballooning debt obligations, precarious financial situation, falsified financial statements, and the existence and consequences of the Compensation Guarantees.  This knowledge is evidenced both by written communications including Shutran and D'Alessandro and by virtue of their senior positions, responsibility for Dewey's finances, and responsibility for the Note Offering.

184.    Dewey, D'Alessandro, and Shutran intentionally or recklessly disregarded that the documents and statements, including the Offering Materials, issued and disseminated by Dewey, were materially false and misleading.

**P.    Jurisdictional Facts**

185.    The Notes were offered to the Aviva Plaintiffs in Iowa through materials provided to the Aviva Plaintiffs in Iowa.  The Aviva Plaintiffs relied on the documents and information provided to them in Iowa in making the decision to purchase the Notes.  The Aviva Plaintiffs' decision to purchase the Notes occurred in Iowa and the Notes were sold to them in Iowa.  Moreover, Dewey held a March 8, 2010 conference call during which potential investors, including the Aviva Plaintiffs, were provided with false information about Dewey, SEC Complaint ¶ 90; the Aviva Plaintiffs joined that call from Iowa.

**FIRST CAUSE OF ACTION**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**

186.    Plaintiffs repeat and reallege each and every allegation contained above, as if set forth herein.

187.    Dewey[5], D'Alessandro, and Shutran, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails and wires, intentionally and/or recklessly participated in a continuous course of conduct that operated to deceive the Aviva Plaintiffs; made untrue statements of material fact and/or omitted material facts that should have been disclosed to make the statements made not misleading, and had ultimate authority over the content of these statements and omissions; and employed devices, and artifices that operated to deceive the Aviva Plaintiffs in connection with the purchase and sale of securities, and caused the Aviva Plaintiffs to purchase the Notes.

188.    Pursuant to the aforesaid plan and course of conduct, Dewey, D'Alessandro and Shutran prepared and issued the Offering Materials referred to above and provided information in connection with the Note Offering and had ultimate authority over these statements and documents.  These statements and documents were materially false and misleading in that, among other things, they misrepresented Dewey's true financial condition and failed to disclose the existence, extent, and consequence of the Compensation Guarantees.

189.    Dewey, D'Alessandro, and Shutran had actual knowledge of or recklessly disregarded Dewey's true financial condition and the existence of and risk presented by the Compensation Guarantees and acted intentionally or with reckless disregard of the truth.  Dewey, D'Alessandro's, and Shutran's material misrepresentations and/or omissions were done

---

[5] Dewey is insolvent and therefore is not named as a party to this proceeding.

US2008 3790717 5

knowingly or recklessly for the purpose and effect of inducing the Aviva Plaintiffs to purchase the Notes.

190.     As a result of the dissemination of the materially false and misleading information and failure to disclose such material facts as set forth above, the Aviva Plaintiffs could not properly assess the risk factors associated with purchasing the Notes.

191.     The Aviva Plaintiffs reasonably relied upon the materials disseminated by Dewey, D'Alessandro, and Shutran in their decision to purchase the Notes.  At the time of said misrepresentations and omissions made by Dewey and Defendants in connection with the issuance of the Notes, the Aviva Plaintiffs did not know and could not have known of the falsity of these statements.  Had the Aviva Plaintiffs known of Dewey's true financial condition and the existence of the Compensation Guarantees, the Aviva Plaintiffs would not have purchased the Notes.  The material misrepresentations and omissions particularized herein directly or proximately caused the damages suffered by the Aviva Plaintiffs.

192.     By virtue of the foregoing, Dewey, D'Alessandro and Shutran have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**SECOND CAUSE OF ACTION**
**Violation of Section 20(a) of the Exchange Act**

193.     Plaintiffs repeat and reallege each and every allegation stated above, as if fully set forth herein.

194.     As set forth above, Dewey is an individual liable under Section 10(b) of the Exchange Act.

195.     By reason of their high-level position, policy-making responsibilities, and control over Dewey's day-to-day affairs, D'Alessandro and Shutran were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power to influence, direct, and control,

US2008 3790717 5

and did influence, direct, and control Dewey to engage in the unlawful conduct complained of herein.

196.    Through their position of control and authority as high-level managers of Dewey and direct involvement in the day-to-day operations of Dewey, D'Alessandro and Shutran were able to and did influence, direct, and control Dewey and the content of the statements disseminated by Dewey in connection with the Note Offering.  Because of their positions, D'Alessandro and Shutran had access to adverse non-public financial information and information regarding the existence of the Compensation Guarantees and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.  With knowledge of the falsity of the statements contained therein or in reckless disregard of the truth, D'Alessandro and Shutran caused dissemination of the false and misleading statements and omissions of material facts as alleged herein.

197.    By virtue of the foregoing, D'Alessandro and Shutran have violated § 20(a) of the Exchange Act.

198.    Plaintiffs have been damaged by these violations as described in this Count and seek recovery of damages caused thereby.

### THIRD CAUSE OF ACTION
### Violation of Iowa Code § 502.509(2)

199.    Plaintiffs repeat and reallege each and every allegation stated above, as if fully set forth herein.

200.    Dewey, D'Alessandro, and Shutran, sold the Notes by means of untrue statements of material fact and omissions of material fact that should have been disclosed in order to make the statements made, in light of the circumstances under which they were made, not misleading.

-49-

201.    The Aviva Plaintiffs did not know that the statements were untrue and were unaware of omissions made by Dewey, D'Alessandro, and Shutran, and in the exercise of reasonable care, could not have known of the untruths or omissions.

202.    Dewey, D'Alessandro, and Shutran knew of the untruths and omissions or should have known of the untruths omissions in the exercise of reasonable care.

203.    The Aviva Plaintiffs reasonably relied upon the materials disseminated by Dewey, D'Alessandro, and Shutran and other representations made by Dewey in deciding to purchase the Notes.  Had the Aviva Plaintiffs known of the material adverse information that was not disclosed by Dewey, D'Alessandro, and Shutran, they would not have purchased the Notes.

204.    The Aviva Plaintiffs are entitled under Section 502.509(2) of the Iowa Securities Act to actual damages, plus interest at the legal rate from the date of purchase, plus costs and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
### Violation of Iowa Code § 502.509(7)

205.    The Aviva Plaintiffs repeat and reallege each and every allegation stated above, as if fully set forth herein.

206.    Dewey is liable under the Iowa Securities Act, Iowa Code § 502.509(2). D'Alessandro and Shutran are therefore liable under Iowa Code § 502.509(7), because they directly or indirectly controlled Dewey.

207.    Dewey sold the Notes by means of untrue statements of material fact and omissions of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

US2008 3790717 5

208.    The Aviva Plaintiffs did not know that the statements were untrue and were unaware of omissions made by Dewey, and in the exercise of reasonable care, could not have known of the untruths or omissions.

209.    Dewey knew of the untruths and omissions or should have known of the untruths and omissions in the exercise of reasonable care.

210.    The Aviva Plaintiffs reasonably relied upon the materials disseminated by Dewey and other representations made by Dewey in deciding to purchase the Notes.  Had the Aviva Plaintiffs known of the material adverse information which was not disclosed by Dewey, they would not have purchased the Notes.

211.    D'Alessandro and Shutran directly or indirectly controlled Dewey and knew, or in the exercise of reasonable care should have known, of the conduct giving rise to liability under Iowa Code § 502.509(2).

212.    Therefore, D'Alessandro and Shutran are liable to the Aviva Plaintiffs for actual damages, plus interest at the legal rate from the date of purchase, plus costs and reasonable attorneys' fees.

WHEREFORE, Plaintiffs seek a trial by jury on all matters and judgment against D'Alessandro and Shutran:

1.    For losses in an amount to be proven at trial;

2.    Plus prejudgment interest;

3.    Plus reasonable attorneys' fees;

4.    Plus such other and further relief as the Court deems equitable and just.

US2008 3790717 5

DATE: April 10, 2015

Respectfully submitted,

  /s/ John T. Clendenin
John T. Clendenin #AT0001529
NYEMASTER GOODE, P.C.
700 Walnut St.
Suite 1600
Des Moines, IA 50309
Telephone: (515) 283-3138
Facsimile:  (515) 283-8045
jtc@nyemaster.com

Counsel for Plaintiffs

US2008 3790717 5